Samuel Donner (Transferee of Cottage Toll Homes, Inc.), et al. [1] v. Commissioner. Donner v. Commissioner
Docket Nos. 36844, 36845, 36846, 36847, 36857.
United States Tax Court
1953 Tax Ct. Memo LEXIS 51; 12 T.C.M. (CCH) 1335; T.C.M. (RIA) 53373; November 27, 1953
*51 Daniel Katz, Esq., 10 East 40th Street, New York, N. Y., and Meyer Bodenstein, Esq., for the petitioners. John J. Madden, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax and declared value excess profits tax against Cottage Toll Homes, Inc., transferor of petitioners, as follows: Declared Value
Income
Excess Profits
Year
Tax
Tax
1944
$ 411.25
1945
142.94
$21.26
1946
44,617.03 Petitioners admit that they are transferees of Cottage Toll Homes, Inc., hereinafter called "the transferor," and that they are liable for any deficiency to the extent of the value of the assets received by them. The questions presented for decision are: 1. Whether the gain on the sale of certain parcels of real property in 1946 is taxable to the transferor. 2. Whether said gain is taxable at ordinary income or capital gain rates. 3. Whether the gain realized by the transferor from the sale of other parcels of real property in 1944 and 1945 is taxable at ordinary income or capital gain rates. 4. Whether certain rental income realized in 1946 from various parcels *52 of real property prior to the dates of their sales is taxable to the transferor. Findings of Fact Some of the facts were stipulated and they are hereby found. The transferor was organized under the laws of Virginia on February 4, 1942. It filed its Federal tax returns for the years involved with the collector of internal revenue for the third district of New York. Its returns were filed on an accrual basis of accounting. By the terms of the transferor's corporate charter it was authorized to engage generally in the real estate business, including the buying, selling and renting of real estate. All of the transferor's stock, consisting of 120 shares, was at all times held of record by James Monaco and Charles Donner, two of the petitioners, hereinafter sometimes referred to as "Monaco" and "Donner," and was beneficially owned by them and Samuel Donner, Edward Donner (now deceased), and Louis Banks, hereinafter referred to collectively as "petitioners," [2] as follows: Charles Donner
10 shares
Samuel Donner
10 shares
Edward Donner
10 shares
Louis Banks
30 shares
James Monaco
60 shares
*53 In the latter part of 1941, Jack Halperin of J. Halperin & Company, a large mortgage broker, interested Monaco and Donner in building houses in Norfolk, Virginia. After the transferor was formed and land in Norfolk was acquired, J. Halperin & Company arranged for the necessary financing and secured the priorities for materials and preference ratings required for such construction. During 1942 and 1943 the transferor constructed and virtually completed 94 single family dwellings. The transferor employed Halperin Management Company as its rental and management agent. The houses were rented for fixed terms pursuant to written leases which contained no provisions for their sale. In 1943, the transferor sold a portion of its vacant, unimproved acreage because it wanted to curtail the extent of its building operations. During 1944 three of the houses together with the lots were sold by the transferor and three others were sold by it during 1945. These houses were sold to the respective tenants who occupied them. Such sales were neither advertised for nor solicited, and the transferor had not intended to sell these houses. In October 1945, all restrictions relating to the occupancy *54 and disposition of priority-constructed housing were revoked. At that time the transferor still owned 88 houses which were being rented and for which no sales were being solicited. With the war over, petitioners were afraid that their investment might become of little value. They discussed with their accountant, Maxwell Zabelle, and with representatives of J. Halperin & Company various plans for liquidating their investment in the transferor. These included disposing of all corporate assets in one sale, selling the stock of the corporation, and selling the houses individually. Some attempt was made to negotiate a sale of the stock but it proved unsuccessful. In January 1946, petitioners considered liquidating the transferor and selling the houses to individual purchasers. They requested their accountant to go to Norfolk and consult counsel as to the necessary legal steps to accomplish such liquidation. Zabelle went to Norfolk on January 16, 1946, and he and Monaco, following a conversation with Gabriel Schwartz of J. Halperin & Company concerning the prospective sale of the houses, consulted with W. R. Ashburn, a Virginia attorney. Azbelle and Monaco advised Ashburn that the transferor's *55 stockholders were considering liquidating the company. Shortly thereafter Donner and Monaco discussed with J. Halperin & Company the basis upon which the Halperin organization would be willing to handle the ultimate sale of the houses to individual purchasers. On February 19, 1946 the Cottage Sales Corporation, hereinafter sometimes referred to as "Cottage Sales," was organized by the Halperin organization to handle the sale of the houses. During the months of March and April 1946, Cottage Sales expended monies for printing, advertising, the securing of a broker's license, and the printing of sales contracts. On March 28, 1946, the transferor, through Monaco, its President, entered into a final written agreement with J. Halperin & Company whereby the latter organization agreed to set up a corporate sales agent to dispose of all the properties of the transferor. The terms of the agreement were embodied in a letter addressed to the transferor. The letter reads as follows: "J. HALPERIN & COMPANY MORTGAGE LOANS 163-18 Jamaica Avenue JAMAICA 3, N. Y.Jamaica 6-2800 March 28, 1946 "Cottage Toll Homes, Inc. 535 Johnson Avenue Brooklyn, New York "Attention of Mr. Charles Donner
*56 "Gentlemen: "This letter will serve to supplant our previous agreement of February 9, 1946 and will serve to verify our agreement regarding your houses in Norfolk, Virginia. As I understand it, we or a company to be formed by us, the name of which we contemplate will be Cottage Sales Corporation, is given the exclusive right to sell these houses at price to be set by us or by our company. We agree to bear all sales expenses, advertising expenses, renovation expenses, etc.; the amount to be expended for such items to be within our discretion. "You agree that we shall have the right to sign contracts for the sale of these houses in your name as agents pursuant to the agreement and that you shall deliver the necessary deeds to us in connection with all title closings. From the proceeds of the sale, you are to retain the sum of $960 above the balance remaining due on the existing mortgage at the time of closing, and the balance of the proceeds of the sale is to be paid to us for our services in connection with the sale of the houses and to compensate us for our expenses incurred. The houses without dormer windows are to be sold by us at not more than $5,200 and the houses with dormers *57 at not more than $5,300. We are to be permitted to charge $150 extra for corners and $100 extra if the houses are on Cottage Toll Road. "Any reserves on deposit with the bank in connection with the existing mortgages shall be assigned by your company to the purchaser of the house. "After a house becomes vacant, same will not be rented by you. It is our understanding that after a house has been vacant for one month, we are to pay the lending company their monthly payment, which includes interest, amortization, taxes, and insurance, if no contract of sale has been entered into; our payment to start thirty days after either the house is vacated or you receive no rent. "During the term of this contract, we agree to manage the above houses and you agree to pay us therefore a management fee of 5 per cent of the gross rental collections. "If this is your understanding of our agreement, will you kindly sign and return the enclosed copy. "Very truly yours, "By GABRIEL SCHWARTZ (signature) "WE AGREE TO THE ABOVE: COTTAGE TOLL HOMES, INC. By JAMES MONACO, PRES. (signature)" On April 20, 1946, Ashburn transmitted to New York certain documents which were to be executed by Monaco, *58 Donner and Louis Banks. These documents included: (1) minutes of a meeting of the transferor's Board of Directors, dated April 4, 1946, reporting the adoption of a resolution to dissolve the transferor and distribute its assets; (2) minutes of a meeting of the transferor's stockholders, dated April 16, 1946, embodying a formal ratification of the directors' decision; (3) a deed of bargain and sale from the transferor to James Monaco, Trustee; and (4) a certificate of unanimous consent to dissolution of the corporation. The directors' and stockholders' meetings were stated to have been held in Ashburn's office in Norfolk, Virginia on April 4, 1946 and April 16, 1946, respectively. No meetings of the transferor's stockholders or directors were ever held in Norfolk, Virginia. The minutes were prepared by Ashburn, were forwarded from his office in Norfolk to the officers and stockholders of the transferor in New York, and were signed by those individuals in New York. In a letter to Monaco dated May 1, 1946 Ashburn stated: "I duly received your letter of April 23rd with the enclosed papers relating to the dissolution of Cottage Toll Homes, Inc. and the transfer of its assets in redemption *59 of its outstanding capital stock. All of the papers appear to have been properly executed. "Since preparing these papers and sending them to you for execution, I have been making a search of the authorities to attempt to make certain that the procedure first outlined will accomplish the object which you desire, namely the avoidance of a capital gain to the corporation and a second capital gain to the stockholders when the properties are ultimately transferred to third party purchasers. I am considerably disturbed by what I have found in that search. I find several Federal cases whose holdings may be summarized in the following language: 'The usual method of winding up the affairs of a corporation is to place its assets in the hands of a trustee for dissolution. When this is done, the liquidation of assets and debts of the corporation is accomplished but the trustee stands in the stead of the corporation for tax purposes, and the gain or loss is that of the corporation. If the corporation wishes to avoid such tax effects, there must be a formal distribution in kind of the assets to the stockholders. After such distribution, the latter may designate one or several of their number, *60 or any other persons, to act as trustee or agent in order to dispose of the assets.' "Concluding that it is not wise to take this risk, * * * Accordingly, I feel that the best course to follow is to have Cottage Toll Homes, Incorporated convey to James Monaco and Charles Donner, and to have these parties and their respective wives subsequently execute every bargain and sale deed to the individual purchasers. I realize that this is a great nuisance but it is less hazardous and less expensive than any other course which can be pursued. "I have prepared and herewith enclose a new Deed of Transfer to be executed by Cottage Toll Homes, Incorporated, by James Monaco as President and Ly Banks as Secretary. While awaiting the return of this Deed, I will file the Unanimous Consent to Dissolution, dissolve the corporation and revise the Minutes. If you will inform me as to the names of Mrs. Monaco and Mrs. Donner, and their present whereabouts, we will have the bargain and sale deeds printed and transmitted to you so that all can be simultaneously signed and acknowledged and returned to this office. All notarial acknowledgments must bear the seal of the notary public executing the notary *61 certificate." The deed conveying all of the transferor's property, subject to its liabilities, to James Monaco and Charles Donner was forwarded by Ashburn on May 1, 1946 for execution. Such execution occurred between May 2 and May 7, 1946, but was dated April 16, 1946. The deed was recorded in the office of the Clerk of the Corporation Court of the City of Norfolk on May 8, 1946. Certain pages of the minutes of the directors' and stockholders' meetings refer to a deed of the corporate property to James Monaco and Charles Donner. Although dated in April 1946, the minutes were prepared in part some time after May 1, 1946. The corporate acts relating to the liquidation and dissolution of the transferor were not performed on the dates noted on the various documents. Such documents were all back-dated in an effort to avoid a tax on the transferor. Neither petitioners nor the transferor itself ever attempted to sell any of the dwellings by solicitation of purchasers or advertising. The sales of the 88 houses to individual purchasers were made pursuant to separate printed contracts, signed by Cottage Sales which was designated therein as "agent for owner." Forty-three of the 88 contracts *62 were introduced in evidence. Of those submitted, the earliest date any such contract was entered into was April 8, 1946. Thirty of these contracts were entered into prior to May 2, 1946. The dates on which the 43 submitted contracts were entered into are as follows: Number *
Purchaser
Date
1
Hollins
July 24, 1946
2
Goff
July 24, 1946
3
Wright
June 27, 1946
4
Warren
June 8, 1946
5
Finney
May 29, 1946
6
Freeland
May 18, 1946
7
Browning
May 18, 1946
8
Roberts
May 17, 1946
9
Tarkington
May 11, 1946
10
Vernon
May 10, 1946
11
Promutico
May 10, 1946
12
Schiller
April 28, 1946
13
Midgett
April 24, 1946
14
Wileman
April 22, 1946
15
Wilkerson
April 18, 1946
16
Steadman
April 17, 1946
17
Carter
April 13, 1946
18
Liles
April 13, 1946
19
Dooley
April 13, 1946
20
Kelley
April 13, 1946
21
Hodges, Jr.
April 12, 1946
22
Carter
April 23, 1946
23
Parker
May 15, 1946
24
Pinkos
May 11, 1946
25
Etherington
May 1, 1946
26
West
April 30, 1946
27
Crump
April 30, 1946
28
Wingate, Sr.
April 27, 1946
29
Rudiger
April 23, 1946
30
Daley
April 24, 1946
31
Trower
April 24, 1946
32
Bolt
April 23, 1946
33
Shaw
April 20, 1946
34
Bryant
April 18, 1946
35
Kinney
April 8, 1946
36
Rollason
April 18, 1946
37
Reynolds
April 17, 1946
38
Hellen
April 15, 1946
39
Steele
April 15, 1946
40
Mohler
April 13, 1946
41
Tebo
April 12, 1946
42
Fester
April 12, 1946
43
Miller
April 11, 1946
*63 Each contract stated that a specified amount of cash, usually $25, was to constitute "earnest money to be refunded on settlement, or retained in event of Purchaser's failure to accept Deed," and provided in part as follows: "Execution and delivery by Purchaser and wife or husband, if married, contemporaneously with delivery of deed and on settlement, of FHA and/or convential deed of trust and notes (as designated by Seller) [Cottage Sales] to Cottage Sales Corporation, or other person, firm or corporation designated by Seller, totaling , payable for interest and principal at not more than per month, together with advances for loan and closing costs, one-twelfth of estimated annual taxes, insurance premiums required and assessments. Deeds of trust and notes to be on forms prepared by Seller or Federal Housing Administration and/or Veterans Administration, or any lender designated by Seller. "Purchaser will make any application which may be necessary to secure the contemplated mortgage loan and will supply all information which may be required in connection therewith. "The undersigned Seller acknowledges *64 receipt of earnest money and agrees to sell on terms stated herein, subject to the conditions hereof. "It is understood and agreed, however, that Seller is engaged in marketing the properties known as Cottage Toll Homes, in the order in which said properties are vacated by tenants now occupying them, * * *" The deeds conveying the properties to the purchasers were signed by Donner, Monaco, and their wives. The form of these deeds had been prepared by P. A. Agelasto, Jr., another Norfolk attorney, and had been forwarded by him to Monaco and Donner. The latter individuals, together with their wives, had signed these deeds in blank and the names of the purchasers, together with the description of the property sold, had been added subsequently. The sales were closed and consummated by Agelasto who attended to the actual deliveries of the deeds. The earliest date of closing of a sale of any of the houses to an individual purchaser was May 31, 1946. All 88 sales were closed between that date and November 21, 1946. The proceeds of such sales were received at the time of the closings by Agelasto who periodically remitted to the petitioners the amounts due them. The transferor was formally *65 dissolved in accordance with the laws of the State of Virginia on September 16, 1946, upon filing with the Virginia State Corporate Commission a Unanimous Consent by Stockholders to Dissolution which purportedly had been dated and acknowledged on April 20, 1946. The investment of the stockholders in the transferor amounted to $20,400.00. The transferor borrowed sums in excess of $350,000 in order to complete the building of the houses. During the calendar years 1943, 1944 and 1945 the transferor reported net income in the respective sums of $1,920.74, $4,233.55 and $4,861.11. In the deficiency notices addressed to the petitioners, respondent explained some of his adjustments as follows: * * *
"(c) Net rental income reported by individual stockholders held to be reportable by Cottage Toll Homes, Inc., $1,760.60 plus adjustment for Virginia capital stock tax of $380.54 deducted by corporation and also by the stockholders. "(d) It is held that Cottage Toll Homes, Inc. realized $120,906.26 income on the sale of 88 houses and furnishings, as shown by the following: "Proceeds of sale of 88 houses
$394,955.50
Adjusted basis of buildings
$262,677.72
Land
11,971.52
274,649.24
120,306.26
Proceeds of sale of furnishings
600.00
Total
$120,906.26"
*66 * * *
The value of the property and assets of the transferor received by the respective petitioners upon its liquidation was as follows: Charles Donner
$10,546.48
Samuel Donner
10,546.48
Edward Donner (Deceased)
10,546.48
Louis Banks
31,639.43
James Monaco
63,278.87
The sales of the 88 houses in 1946 were in substance the sales of the transferor. The transferor was at all times engaged primarily in the business of constructing, owning, holding, and operating single family dwellings in Norfolk, Virginia, for rental only. The houses which were sold were not held by the transferor for sale to customers in the ordinary course of its business, and had been held by it for periods of more than six months prior to their sale. The income realized in the year 1946 from the rental of the dwellings from and after April 20 amounted to $2,141.14. This income was realized by the transferor as the owner of the properties involved. Opinion We shall accept for purposes of discussion the summary of the facts as set forth in petitioners' brief: "The uncontradicted evidence establishes that on May 8, 1946 at the latest [3] Cottage Toll Homes, Inc. transferred *67 and conveyed all of its property (including the 88 dwellings which were the subject of the sales here in question) to Charles Donner and James Monaco, its stockholders of record, in complete liquidation * * * that from time to time thereafter between May 31, 1946 at the earliest, and November 21, 1946, said stockholders (and not Cottage Toll Homes, Inc.) delivered deeds executed by them conveying the dwellings to the individual purchasers * * * and that the stockholders (rather than Cottage Toll Homes, Inc.) received the consideration paid by such purchasers for such conveyances * * *." And at another point: "* * * Following the distribution of the corporate property to them in liquidation, the shareholders were in fact the owners of such property and Cottage Toll Homes, Inc. [the transferor] necessarily thereafter engaged in no business * * * (Italics supplied.)" *68 To this must be added the likewise uncontradicted facts that before [4] May 2 an undisclosed number of sales contracts, not less than 30, had been entered into presumably on behalf of the corporation, which then owned the property. [5] In fact not more than 13 of the 88 contracts are shown to have been entered on May 2 or later. On petitioners' own statement we must accordingly conclude that unless the date of passage of title rather than that of negotiation and commitment for sale is decisive, and unless the fact that at the former date title had been transferred from the corporation to the stockholders in liquidation suffices to attribute such sales to the stockholders and not to the corporation, the great bulk of this property was the subject of corporate sale and the gains includible in corporate income. But in no case to which we have been referred has any such principle been announced. In the leading case on the subject, , the contract covering the transfer was oral and presumably unenforceable. *69 And in such cases as , affd. , conclusive negotiation with the corporation while the property remained in its ownership was held sufficient to constitute the transaction a corporate sale. As we in fact said in the Kaufmann case (p. 488): "Here, the facts show, and are so construed by petitioners, that no steps whatsoever were taken toward liquidation until the deal for sale of the property had been conclusively agreed to." We think it follows that the mere fact that the closing of title to the properties in question did not take place until after the transfer in liquidation is insufficient to remove this situation from the Court Holding Company rule. Except as to the 13 properties, the conclusion is inescapable that the sales were made by the corporate transferor. It does not follow however that as to the 13 properties where contracts were executed subsequent to May 2 the sales were those of the stockholders rather than of the transferor corporation. Not only is there a complete absence of evidence as to what the state of negotiations was with respect to these properties on *70 May 2 but more important the corporation had disabled itself, and hence had disabled these transferees, from making contracts on any other terms than those covered by the definitive and binding agreement with the organizer of Cottage Sales. As in , the steps taken thereafter by the stockholders to transfer the property "were not taken for the purpose of liquidating the corporation in the ordinary way but solely for the purpose of carrying out the sale of the corporate property * * * under the then existing contract. It follows that in the liquidation the stockholders were mere conduits through which the title to the property passed * * * [on terms] previously agreed upon." It is true that in the Kaufmann case the contract in question was with the ultimate purchaser whereas here it was made with a selling organization which was to discover and produce the ultimate purchasers. But the terms of the sales so to be made were fixed so that the purchase money receivable by the corporation was determined before any liquidation, and long before dissolution. What the stockholders received they accordingly obtained as a result of the contract made *71 by the corporation [6] before any liquidation or dissolution had occurred, and the stockholders were no more free agents in dealing with the property than were those in the Court Holding Company, Kaufmann, Trippett, [7] and other similar cases. And in , we are told in footnote 4: "It has also been held that where corporate liquidations are effected through trustees or agents, gains from sales are taxable to the corporation as though it were a going concern." *72 In fact Cottage Sales was itself more nearly in the position of a purchaser. Not only was it bound to sell the houses for a specified amount transmitting a definite sum in each case to the corporation, but if a house was not sold within a short time after becoming vacant, its organizer and not petitioners' transferor was obligated to pay all carrying charges. We have accordingly found that all of the sales, including the 13 now under discussion, were made by the corporate transferor. By the same token, however, it seems to us to follow that the corporation was not in the business of selling houses and hence that the properties in controversy were not held by the corporation for sale in the ordinary course of its trade or business. Considering the details of the contract the transaction resembled more a single sale of an entire tract to one who would then undertake the disposition of the smaller parcels. Cf. , certiorari denied . Cottage Sales, organized by J. Halperin & Company to sell the houses, was not the creature of petitioners nor their transferor, and was not under their domination or *73 control. We accordingly conclude that the gain on the sales in 1946 was capital gain to the transferor and not ordinary income. We reach a similar result as to 1944 and 1945 in each of which years only three houses were sold. The evidence shows that no effort was made to effect these sales, and their small number, infrequency, and the lack of activity of the transferor with respect to them, all negate the carrying on of business in that respect. ; Walter R. Crabtree, 20 T.C. - (July 22, 1953). The final issue deals with an item of $2,141.14 collected as rents on the houses prior to the closings and attributed by respondent to the transferor corporation. As far as the record shows, all of the leases under which the rent was collected were made by the corporation. Whether the individual items constituting the total rent were the product of houses sold before or after May 2 does not appear. But in any event the transferor having been on an accrual basis the rents would be includible in its income on any theory of the case if they were due prior to the time of transfer of title to the stockholders. The record contains *74 no evidence from which we can determine the due date of a single rental payment. The burden of showing the essential facts having rested upon petitioners and no evidence in this respect having been produced, the necessary result is that the income in question must be assumed to have been earned by the corporation and that on this issue respondent's determination must be sustained. See ; ; , certiorari denied ; , affd. (C.A. 5) . Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: James Monaco (Transferee of Cottage Toll Homes, Inc.), Docket No. 36845; Charles Donner (Transferee of Cottage Toll Homes, Inc.), Docket No. 36846; Estate of Edward Donner, Deceased, Charles Donner, Samuel Donner and Maxwell Zabelle, Executors (Transferee of Cottage Toll Homes, Inc), Docket No. 36847; and Louis Banks (Transferee of Cottage Toll Homes, Inc.), Docket No. 36857.↩
2. The actual petitioner in the case of the deceased Edward Donner is the Estate of Edward Donner, deceased.↩
*. This is the order in which the contracts are listed in an exhibit.↩
3. While the deed may in fact have been executed prior to May 8 it could not have been much earlier. In a letter dated May 1 the attorney in Norfolk, Virginia mailed the deed to New York City for execution. Allowing time for transmission through the mail to New York and back to Norfolk, the execution must have taken place between May 2 and May 7, and we have accordingly found this to be the fact.↩
4. See footnote 3, supra. ↩
5. The contracts were executed by Cottage Sales which denominated itself "agent for owner."↩
6. The agreement for the sale of the property by Cottage Sales was contained in a letter addressed to the transferor corporation for the reason as testified by petitioners' witnesses and as stated in petitioners' brief "that he [the sender] felt that the company as the then owner of the property should be the contracting party * * *." In this connection it is relevant to consider the language of Judge Learned Hand in , certiorari denied , distinguishing : * * * that case turned upon the fact that all the preliminary negotiations had been made expressly with the corporation; and that it was only after the bargain had been struck, that the device of a liquidation was brought in as deus ex machina. The contrary was true here. (Italics supplied.)↩
7. , certiorari denied, .↩